J-S04034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1654 MDA 2018 |

Appeal from the Decree Entered August 28, 2018
in the Court of Common Pleas of Tioga County Orphans' Court at No(s):
136 OC 2017

BEFORE:   SHOGAN, J., OTT, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED MARCH 01, 2019**

F.G. ("Mother") appeals from the decree of the Tioga County Court of Common Pleas,[1] granting the petition of J.G. ("Father") and involuntarily terminating Mother's parental rights to their son, P.G. ("Child"), born in December 2010, pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b).  We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] While there is a notation on the decree indicating that it was sent to the parties' attorneys, there is no notation on the docket that notice was given and that the order was entered for purposes of Pa.R.C.P. 236(b).  **See Frazier v. City of Philadelphia**, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); **see also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)").  Thus, the order was not entered and the appeal period not triggered.  Although we consider the matter on the merits, we caution the Clerk of Orphans' Court as to compliance with these rules.

The orphans' court summarized the relevant factual background as follows:

> [C]hild has been constantly in the care and custody of [Father] since he was nine (9) months of age. Numerous proceedings have been conducted concerning the custody of the child between the parties during the course of the child's life. The most recent custody order in this action dates from the year of 2014. The custody order currently in effect is dated April 2nd, 2014, and provides [Father] with sole legal and physical custody of the child. This Order was introduced and admitted as Plaintiff's Exhibit 1, and provides that [M]other shall have "supervised visitation at such times and places as . . . Father. . . may approve."
>
> During the child's life, at least since he was one and a half (1 1/2) years old, the child has resided in a home shared between [Father] and his now wife, [Stepmother]. During that time, [Father] and his wife have provided all necessary services, means and resources to attend to the medical, developmental, educational, and other needs of the child. Testimony of [Stepmother] establishes that she has established a mother-like bond with the child and considers the child to be equivalent to her own biological child. Her testimony establishes that the child calls and identifies her as mother.
>
> The evidence presented through the testimony of [Father] and his exhibits establishes that [Mother] has had little contact with the child despite provision for the same in the [c]ourt [o]rder. Specifically, the [c]ourt notes that Mother had two (2) in-person contacts with the child during the calendar year of 2017, one being at a wrestling match in January and the second and final being on or about June 5th, 2017, at a baseball game. Mother subsequently had contact with the child either directly by phone or indirectly through her mother, the maternal grandmother, and communicated with the child during [M]aternal [G]randmother's period of partial custody. The [c]ourt notes that it is uncontroverted that this contact, be it directly between [Mother] and the child or as facilitated by [M]aternal [G]randmother, was in violation of the established court order and resulted in a finding of contempt against [M]aternal [G]randmother.

Findings of Fact and Opinion, 8/28/18, at 2-3.

On December 22, 2017, Father filed a petition to involuntarily terminate Mother's parental rights. After several continuances, the orphans' court held a hearing on August 23, 2018. Father presented the testimony of Stepmother and Dr. Denise Feger, an expert in the field of trauma and attachment, who testified as to her behavioral health/trauma evaluation of Child.[2] Additionally, Mother, who was present and represented by counsel, initially testified on her own behalf. However, Mother left the courtroom, and ultimately the building, in the middle of cross-examination and her testimony was stricken.[3] N.T. at 164-65, 173-74. Child was represented by a Guardian *ad Litem*, Rita G. Alexyn, Esquire, and a legal interests counsel, Patricia Shipman, Esquire.[4]

---

[2] While the orphans' court referenced Dr. Feger as an expert in bonding and attachment, it is believed that the court misspoke, as Dr. Feger was offered as an expert as to trauma and attachment. N.T. at 7-8.

[3] Specifically, the orphans' court stated,

> preliminarily, I'm going to note for the record it is my intention to strike, strike the testimony of [Mother], given the fact that she willfully and voluntarily [] left the stand and the courtroom and, in fact, after re-entering the courtroom and advised of the potential consequence of having her testimony stricken, again, left the courtroom and, subsequently, left the building. And so I think to do otherwise would provide an unfair advantage and would condone improper conduct, so I'm going to strike that testimony.

N.T. at 173-74. Counsel for Mother requested a continuance, which the court denied. *Id.* at 165-66, 168-69. Counsel could not present the testimony of Maternal Grandmother, who had also left the building. *Id.* at 169-71. Counsel again requested a continuance, which the court denied. *Id.* at 171-72.

[4] Both Attorney Alexyn and Attorney Shipman argued in support of termination of Mother's parental rights. N.T. at 179-83. Attorney Shipman expressed

By decree and opinion dated August 23, 2018, and recorded August 28, 2018, the trial court involuntarily terminated Mother's parental rights. On September 24, 2018, Mother filed a counseled notice of appeal with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following issues for our review:

1. Did the trial court abuse its discretion determining that Mother's contact with the child was minimal?

---

difficulty obtaining Child's preference due to his age and anxiety. She stated, "My role here is somewhat hampered by the young age of my client; I can't really ascertain what his wishes are based on his young age and immaturity and also his anxiety regarding the subject, so I haven't talked to him about it directly." *Id.* at 179.

As such, we find Child had the benefit of legal counsel as required by 23 Pa.C.S.A. § 2313(a). *See In re Adoption of L.B.M.*, 639 Pa. 428, 432, 441-42, 161 A.3d 172, 174-75, 180 (2017) (plurality) (stating that, pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *see also In re T.S.*, _ Pa. _, 192 A.3d 1080, 1089-1090, 1092-93 (2018) (finding the preferred outcome of a child who is too young or non-communicative unascertainable in holding a child's statutory right to counsel not waivable and reaffirming the ability of an attorney-guardian ad litem to serve a dual role and represent a child's non-conflicting best interests and legal interests); *C.f. In re Adoption of T.M.L.M.*, 184 A.3d 585, 587-91 (Pa.Super. 2018) (vacating and remanding for further proceedings where the attorney admitted she did not interview the six-year-old child to ascertain the child's preferences); *In re Adoption of M.D.Q.*, 192 A.3d 1201 (Pa.Super. 2018) (vacating and remanding where the record does not indicate that counsel attempted to ascertain the children's preferences and the record does not reflect the children's legal interests); *In re Adoption of D.M.C.*, 192 A.3d 1207 (Pa.Super. 2018) (vacating and remanding where the record was unclear in what capacity the attorney had been appointed to represent the children and whether the attorney had ascertained the children's legal interests prior to the hearing).

2. Did the trial court abuse its discretion determining that terminating the [m]other's parental rights would be in the best interest of the minor child?

Mother's Brief at 5 (suggested answers omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Clear and convincing evidence is defined as so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), which provide as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first examine the court's termination of Mother's parental rights under Section 2511(a)(1). We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>>
>> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

- 7 -

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed:

> [I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

*In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citation omitted). Further, we have stated:

> [T]o be legally significant, [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d at 1119 (citation omitted); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa.Super 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 616 Pa. at 328, 47 A.3d at 828 (discussing *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975)).

Instantly, relevant to finding grounds for termination of Mother's parental rights to Child pursuant to subsection (a)(1), the orphans' court stated as follows:

Pursuant to Title 23 [Pa.C.S.A.] §2511(a)(1), [Father] is charged with establishing, by clear and convincing evidence, that for a period of six (6) months or more, prior to the filing of the Petition, that the parent by conduct has evidenced a settled purpose of relinquishing parental claim to the child or has refused or failed to perform parental duties. In light of the evidence presented, the [c]ourt determines [Father] has met his burden. In addition to the foregoing discussion, the [c]ourt notes Mother has, by court order, been directed to pay child support, and there is some evidence before the [c]ourt of some payment of child support; however, the law of this Commonwealth is well settled that the mere payment of support does not qualify as fulfillment of parental duties and responsibilities in the face of a claim of abandonment or failure or refusal to perform parental duties. The [c]ourt notes the testimony before it establishes that the sporadic contact between [M]other and [C]hild is the result of Mother's decisions and actions, and is not the result of obstruction or refusal by [Father] to engage in or permit contact. The record before the [c]ourt establishes [Father] has afforded [Mother] the opportunity to have visitation. And while the [c]ourt takes note of the fact that Father has been granted the sole legal and physical custody, that does not remove from Mother the responsibility to advocate on behalf for [sic] [C]hild, including petitioning a court for reconsideration or for an extension of some form of legal or additional physical custody. The [c]ourt notes particularly that the [Father] and his wife have addressed all of the child's needs, and based on their testimony, have attended to his medical and educational, and other needs. There is no evidence before the [c]ourt that Mother, at any time, has made efforts to apprise herself of the child's educational, developmental or medical needs, nor medical providers.

While the circumstances in [sic] apparent addiction of Mother are regrettable and likely contribute to her inability or unwillingness to engage in meaningful performance of parental duties, they [nonetheless] have persisted in spite of the efforts of various individuals to allow [Mother] to maintain a relationship with the child.

Based on the record before it, the [c]ourt is satisfied Mother has ultimately failed to perform parental duties for a period well in excess of six (6) months in advance of the filing of this Petition in December of 2017. In fact, in considering the entirety of this child's life, and the record before the [c]ourt, the pattern is in fact

- 10 -

one of persistent failure to perform parental duties since the child was at least nine (9) months of age.

Findings of Fact and Opinion, 8/28/18, at 3-4.

As to the nature of the testimony as to Mother's contact with Child, the court further indicated,

The [c]ourt notes the highly unusual circumstances within the scope of this particular proceeding, in that Petitioner and his wife both offered factual testimony regarding the contact between Mother and child and the nature, quality and quantity of communication between the parties to this action. Respondent proceeded to offer testimony which was subsequently stricken by the [c]ourt as she voluntarily exited the courtroom and facility prior to the conclusion of her cross-examination. The [c]ourt, therefore, has stricken her testimony and considers uncontested and uncontroverted the evidence presented by Petitioner and his wife, which the [c]ourt notes herein and considers particularly credible in either event.

*Id.* at 3.

Mother, however, argues that the orphans' court made its determination without the benefit of her narrative. She contends that, instead, Father's and Stepmother's testimony was viewed by the court as uncontroverted because her testimony was stricken. Further, she highlights that she did not have custodial rights to Child and her visitation with Child was subject to Father's discretion. Moreover, Mother notes that Father recognized that the expansion of her visitation with Child was conditional. In addition, she points to one instance where she argues that Father obstructed her efforts to have contact with Child. Lastly, Mother maintains that, while she did not pursue litigation to expand her custodial rights, Maternal Grandmother was seeking custodial rights and she could have contact through Maternal Grandmother.

Upon review, we find no reason to disturb the orphans' court's conclusions and discern no abuse of discretion. This Court finds the orphans' court's determination that Mother failed to perform parental duties with regard to Child and its termination of her parental rights under Section 2511(a)(1) is supported by competent, clear and convincing evidence in the record.

The record reveals Mother has a criminal history, including incarcerations, going back to 2009; Mother additionally has a history of incarcerations related to child support as well as a continuing substance abuse problem. *See* Plaintiff's Exhibits 2-7, 9-12, 15, 17-18. Mother was charged with DUI arising out of an incident occurring on October 10, 2017 to which she later pled guilty. On November 6, 2017, in connection with a support hearing, Mother further acknowledged methamphetamine use on three occasions since October 1, 2017. Moreover, after previously being placed on supervised bail and subject to drug and alcohol testing and evaluation, Mother appeared at a prior support hearing on October 24, 2017 under the influence and was found in contempt. Although Mother thereafter entered rehabilitation, it is further reflected that Mother absconded from rehabilitation.

Beyond Mother's substance abuse and incarcerations, the record also reveals a lack of support and significant contact between Mother and Child. At the time of the hearing, Father had exercised primary physical custody of Child for over four years, pursuant to a custody order entered in April 2014; however, Child actually has been in Father's sole custody since he was nine months old. N.T. at 42, 55, 70, 76; *see also* Plaintiff's Exhibit 1. Father

explained that there was only a three-month period of Child's life where Child was not in his custody. N.T. at 70, 76.

Mother was awarded supervised visitation at such times and places as Father approves. *Id.* at 43; **see also** Plaintiff's Exhibit 1. Prior to the entry of this order, Mother had supervised visitation, which Father indicated Mother failed to exercise. N.T. at 44, 72. As Child actively participates in sports, Father felt that giving Mother contact at his sporting events was a good way to initiate and establish consistency. *Id.* at 45, 48, 56-57, 71-74, 83-84. Father stated, "she's allowed []to come to any sporting event and come see [Child] and prove to me that she is sober and she's going to be consistently around, which she has yet to show up to anything consistently." *Id.* at 48.

Mother only saw Child at four to five sporting events in 2016, and two sporting events in 2017. *Id.* at 43, 57, 84. Her last in-person contact with Child was at a baseball game on June 5, 2017. *Id.* at 84. Father noted he never had Mother removed from a sporting event or told her she could not be there, and only once asked Maternal Grandmother to prevent Mother from coming to an event after he became aware of a court document revealing Mother's methamphetamine use. *Id.* at 58, 61. In addition, Father asserted that Mother and Maternal Grandmother have always been able to contact him. *Id.* at 59, 75.

Father further testified that Mother had not called Child or inquired as to Child's wellbeing in years. *Id.* at 44, 49, 59. Father stated, "I haven't really heard from her on the phone in, I think, it's been a couple of years, but

maybe like 2014 or '15, when she would get out of jail she would call me up and she would demand to see [Child] and usually could be pretty belligerent, but that's the last time I remember having any sort of consistent contact would be a few weeks after jail on two separate occasions." *Id.* at 49.

Notably, at the time of the hearing, Mother had not had any contact with Father in a year, other than a message sent to Stepmother through social media expressing Mother's desire to discuss a post-adoption agreement a few weeks prior to the hearing. *Id.* at 43, 59-60, 85. Father observed that Mother does not send cards, letters, or gifts for Child. *Id.* at 45, 60. Stepmother confirmed that, while Mother contacted her in March 2017 regarding swimming lessons for another child and Maternal Grandmother's seeking of custodial rights, Mother never contacted her to see how Child was doing and did not send any cards or gifts. *Id.* at 85-86. Stepmother recalled that Maternal Grandmother came to a birthday party for Child in 2015 and brought a card and gift from Mother. N.T. at 86.

Moreover, Mother did not seek to expand the custody provided to her pursuant to the April 2014 order. Although Mother filed to modify child support approximately twelve times, she only filed one petition to modify custody and failed to show up for the hearing, resulting in dismissal. *Id.* at 49-50, 97. At the time of the termination hearing, Father testified that Mother was approximately $5,000.00 in arrears. N.T. at 50.

Thus, after reviewing the record, we find no abuse of discretion as the orphans' court's termination decree pursuant to Section 2511(a)(1) is

supported by competent, clear and convincing evidence. ***See In re T.S.M.***, 71 A.3d at 267; ***In re Adoption of T.B.B.***, 835 A.2d at 394.

We next turn to whether termination was proper under Section 2511(b). As to this section, our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa.Super. 2012). In ***In re E.M.***, ***[a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]***, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

***In re T.S.M.***, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d at 1121 (internal citations omitted). Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and

citations omitted)).

In the case *sub judice*, in reasoning that termination of Mother's parental

rights favors Child's needs and welfare under Section 2511(b) of the Adoption

Act, the orphans' court stated,

> The [c]ourt having determined [Father] has established, by clear and convincing evidence, grounds for termination pursuant to Title 23 [Pa.C.S.A.] §2511(a)(1), the [c]ourt is charged with the responsibility of determining whether or not the grant of termination would be in the child's best interests. It's well settled this analysis shifts the focus and attention of the [c]ourt from the parent's performance or non-performance to the needs and welfare of the child.
>
> The evidence in this case presented through [Father], his wife, and Dr. F[e]ger, as well as the report of the Guardian Ad Litem and remarks of [c]ounsel, clearly establishes that [Child] identifies the home that [Father] shares with his wife and the child's sibling as home. . . . [C]hild addresses [Father] and his wife as mother and father. The child has all of his medical and developmental and educational needs met. The child's social development and interaction is provided for by [Father] and his wife.
>
> The [c]ourt notes and has particularly considered the testimony of Dr. F[e]ger in this matter and in considering the

- 16 -

anxiety which has been brought into this child's life through actions of [Mother], either directly or with the assistance of her mother[,] who had facilitated and engaged in violations of the [c]ourt's order, which is presumably entered in the best interests of the child, after full consideration of matters and their merits, by that [c]ourt. This [c]ourt considers those actions by Mother and [M]aternal [G]randmother to be a reflection of an absolute neglect and failure to consider the best interests of [Child] and the advancement of [Mother]'s own interests and values over those of the child.

Based on the history this case has presented to this [c]ourt, there is little likelihood that [Mother] will be able to arrive at a point at which she could be meaningfully involved or re-establish or strengthen what little bond there may exist between her and the child. The [c]ourt notes the absence of a formal bond analysis, but does note and has considered the testimony of Dr. F[e]ger that the child recognizes and finds stability and security within the home of [Father] and his wife.

Based on the foregoing, the [c]ourt determines it is clearly in the best interests of the child that the Petition for Termination of Parental Rights be granted. In determining this, the [c]ourt notes with regret that this decision will likely result in some discomfort or anxiety in the child's life given the severance of the bond, but notes that any bond that currently exists between Mother and [C]hild does not appear to have a proper foundation for ensuring the child's long-term stability and well-being, and the severance of a bond at this time will allow him to establish permanency.

Findings of Fact and Opinion, 8/28/18, at 4-5.

Mother, however, argues that the trial court failed to give the appropriate weight to the bond that existed between her and Child. In so arguing, Mother indicates that Dr. Feger did not conduct a bonding evaluation and did not offer testimony as to whether termination would be in Child's best interests. Mother's Brief at 20-21. Mother states,

The [t]rial [c]ourt in its Findings of Fact and Opinion states that it is in the best interest of the child to terminate Mother's

parental rights, even though this could cause some difficulty in the minor child's life given the severance of said bond. During the proceeding, [Father] called Dr. F[e]ger as an expert witness to testify in regards to the minor child's anxiety, and not whether or not termination of Mother's parental rights was in the best interest of the minor child. Further, Dr. F[e]ger did not make a recommendation on this part due to the fact that a bonding evaluation between [M]other and the minor child had not been done. Dr. F[e]ger did offer testimony stating that if Mother were to become the primary caregiver of the minor child, that she believed it would cause anxiety and confusion for the child. Still, the [t]rial [c]ourt was tasked with determining if a parental bond between Mother and [C]hild exists, and if so, if termination would serve in the best interest of the minor child. As such, the trial court erred in ruling for termination of Mother's parental rights without having given sufficient weight to the parent-bond relationship between Mother and the child.

*Id.* We disagree.

Upon review, we again discern no abuse of discretion. The record supports the orphans' court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the orphans' court to make a determination of Child's needs and welfare, and as to the existence of a lack of a bond between Mother and Child that, if severed, would not have a detrimental impact on him.

Child is happy and excelling in the care of Father and Stepmother, who have been Child's primary caregivers since Child was one-and-a-half years old; Father and Stepmother take care of all of Child's needs. *Id.* at 42, 70-71, 76, 80, 83. Child has called Stepmother "mommy or mom" since his younger half-brother was born. N.T. at 80-81. Critically, Stepmother stated that she treats Child as if he were her own and described their relationship as

- 18 -

"a motherly/son relationship," likening the relationship to that she shares with Child's younger half-brother. *Id.* at 79. In comparison, Child calls Mother by her first name and rarely mentions or asks about her. *Id.* at 51-52, 80, 94.

Dr. Feger testified that Child's primary caregivers are identified as Father and Stepmother. *Id.* at 15. Dr. Feger notes that, while there has been a relationship between Mother and Child, "there have been challenges, . . . there have been difficulties and consistency," and the relationship is "fluid" due to the lack of contact. *Id.* at 15, 34. Hence, she opined that there would be anxiety if Mother were reintroduced as a primary caregiver. In response to questioning she stated,

> Q. Okay. If he were, kind of, reintroduced, as it were, to his biological mother, would there be any harm to him in that at this point?
>
> A. If he were reintroduced in the capacity that she's going to serve as a primary caregiver for him, I believe at this point, undeniably, there'd be elevated anxiety levels. His normal home environment and function has been with his stepmother and his father and, so I think there would be a lot of confusion for him on what that would look like; and, ultimately, I think it would be determined how high of an elevation based on what the contact would be and the structure of that relationship.

*Id.* at 28.

Dr. Feger conducted her behavioral health/trauma evaluation of Child shortly after Child had a discussion with Maternal Grandmother regarding his adoption and the termination of Mother's parental rights. *Id.* at 13-14; *see also* Plaintiff's Exhibit 18. Father clarified that Child admitted that Maternal Grandmother told him to ask the judge for "more time with Mammie and to

keep [Mother]." *Id.* at 51.[5]  Father noted that, in relaying this information,

Child "broke down crying three or four times." *Id.* at 52.  Father noted Child

was upset as "he was worried that somebody was going to take him from our

home and away from his mom and his dad, and his brother, and his dog." *Id.*

After this incident, Dr. Feger noted Child was displaying elevated levels of

anxiety and diagnosed Child with an adjustment disorder.  *Id.* at 14.

Of relevance, when asked regarding termination of Mother's parental

rights, Father stated,

> Well it's been seven years of the same thing, right, we just go to
> – we're in trouble, we're in jail, we're nowhere to be found –
>
> . . .
>
> . . .the – the biological mother is not there as a parent; she's in
> jail, she's strung out, she's, you know, just not a parent at all and
> I'm not going to allow her to see him if she's not in a good state
> of mind and she can't consistently be there.  And this has been
> seven years for her to make a step in the right direction and she's
> yet to do so.  And, I don't know, I'd like to have some sort of
> security if something happened to me that my son would go to
> somebody who can take care of him properly.

*Id.* at 54-55.

Thus, the trial court properly found that termination of Mother's parental

rights serves Child's developmental, physical and emotional needs and welfare

pursuant to Section 2511(b).  While Mother may profess to love Child, a

parent's own feelings of love and affection for a child, alone, will not preclude

---

[5] Father indicated that this incident occurred approximately three months prior
the hearing.  N.T. at 51.  Stepmother testified that the incident occurred on
March 25, 2018.  *Id.* at 95.

termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856 (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/01/2019